FILED

2005 Aug-24  PM 01:46
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **CHARLES L. HUGHES,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.: 2:02-CV-1265-RDP** |
| | } | |
| **CITY OF BIRMINGHAM,** | } | |
| **ALABAMA, et al.,** | } | |
| | } | |
| **Defendants.** | } | |

## <u>MEMORANDUM OPINION</u>

Pending before the court are Plaintiff's Motion for Summary Judgment (Doc. #89) filed on June 1, 2004, and Defendants' Motion for Summary Judgment (Doc. #94) filed on June 1, 2004. The court has reviewed the parties' submissions in support of and opposition to these motions.

Plaintiff Charles L. Hughes ("Hughes" or "Plaintiff") filed a verified complaint against the City of Birmingham ("City") and City Attorney Tamara Johnson ("Johnson"), among others, on May 21, 2002, asserting claims under the First Amendment; Equal Protection Clause of the Fourteenth Amendment, 42 U.S.C. §§ 2000e-5, *et seq.* ("Title VII"); by 42 U.S.C. §§ 1981 and 1981a; the Age Discrimination in Employment Act, 29 U.S.C. §§ 201, *et seq.* ("ADEA"); the Equal Pay Act of 1963, 29 U.S.C. § 206(d) ("EPA"); and the Alabama Constitution.  (Hughes Verified Complaint ¶ 1). Plaintiff has conceded that he is no longer pursuing claims for age discrimination; gender discrimination, under both Title VII and § 1983; Equal Pay Act violations; First Amendment

violations;[1] and Alabama constitutional violations.  (Doc. #105 at I.D. at 4).  Accordingly, these claims are due to be dismissed with prejudice.

With respect to Plaintiff's remaining claims, the entry of summary judgment in favor of the City on Plaintiff's Title VII claims for race discrimination and retaliation is appropriate because the City has demonstrated that no material factual disputes exist and that it is entitled to judgment as a matter of law.  The court also concludes that Johnson is entitled to qualified immunity and that the City is entitled to summary judgment on Plaintiff's 42 U.S.C. § 1983 claims.[2]

_____

[1]Later in his brief, Plaintiff states that "[h]is § 1983 retaliation claims exist under the First and Fourteenth Amendments to the United States Constitution."  (Doc. #105 at III.A. at 11).  However, Plaintiff's opposition sets forth no separate analysis regarding retaliation under the First Amendment and how it compares to retaliation asserted under the Fourteenth Amendment and/or Title VII.  *See, e.g., Stavropoulos v. Firestone*, 361 F.3d 610, 620 (11th Cir. 2004) ("Requiring the First Amendment retaliation claimant to show that the action she complains of not only was likely to chill her speech but also altered an important condition of employment insures that she satisfies the injury-in-fact requirement of federal justiciability law. . . .  Thus, we conclude that the district court committed no error by applying Title VII standards of what is an adverse employment action to Stavropoulos's First Amendment retaliation claim.").  Accordingly, Plaintiff has expressly and/or implicitly abandoned any constitutional claims based upon the First Amendment.  *See, e.g., Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1322 (11th Cir. 2001) (finding claim abandoned when argument not presented in initial response to motion for summary judgment); *Bute v. Schuller International, Inc.,* 998 F. Supp. 1473, 1477 (N.D. Ga. 1998) (finding unaddressed claim abandoned); *see also Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) (failure to brief and argue issue at the district court is sufficient to find the issue has been abandoned).  Plaintiff does not respond to this argument and thus is deemed to have abandoned this claim.  *See Resolution Trust Corp. v. Dunmar Corp.,* 43 F.3d 587, 599 (11th Cir. 1995); *Hudson v. Norfolk Southern Ry. Co.,* 209 F. Supp. 2d 1301, 1324 (N.D. Ga. 2001).  *Cf. McMaster v. United States,* 177 F.3d 936, 940-41 (11th Cir. 1999) (claim may be considered abandoned when district court is presented with no argument concerning a claim included in the plaintiff's complaint); *Road Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler Corp.,* 10 F.3d 1563, 1568 (11th Cir. 1994) (concluding that a district court "could properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment.").

[2]For the purpose of summary judgment analysis, Plaintiff agrees that his causes of action under §§ 1981 and 1983 are merged as a matter of law.  (Doc. #105 at I.C. at 3); *see Butts v. County of Volusia*, 222 F.3d 891, 892 (11th Cir. 2000) ("We conclude the amendments did not change § 1981 and § 1983 contains the sole cause of action against state actors for violations of § 1981.")

## I.      Introduction and Background

Plaintiff Charles L. Hughes is a white male who is employed as a lawyer in the City Law Department.  (Hughes Verified Complaint).  Defendants contend (and the court agrees) that certain facts related to the City's employment and termination of James Love ("Love"), and Love's separate lawsuit[3] against the City, are important to understanding their arguments in favor of summary judgment in this case.  Love is an African-American male who is also employed as a lawyer with the City Law Department.  (Charles Hughes First Deposition ("Hughes Depo., Vol. 1") at 68; Charles Hughes Second Deposition ("Hughes Depo., Vol. 2") at 67; James Love Deposition ("Love Depo.") at 10-11).

## II.     Undisputed Facts[4]

Hughes and Love initially applied to the Jefferson County Personnel Board ("JCPB") for attorney positions with the City as Principal Attorneys.  (Hughes Depo., Vol. 1, at 29; Love Depo. at 37).  Prior to joining the City Law Department, Hughes worked in private practice and as a corporate attorney and was experienced in collection work.  (Hughes Depo., Vol. 1, at 17-24).

(footnote omitted).

[3]Love also sued the City in a case filed in this court styled CV 03-AR-816-S.  In his own lawsuit, filed against the City in April 2003, Love seeks recovery for alleged:  (a) retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §1981 and 42 U.S.C. §1983; (b) violations of his right to free association under the First Amendment to the United States Constitution; (c) violations of his right to engage in free speech under the First Amendment to the United States Constitution; (d) violations of his right to free association under the Constitution of the State of Alabama; and, (e) violations of his right to free speech under the Constitution of the State of Alabama.  (Love Amended Complaint, ¶¶ 28-48).  (On June 20, 2003, Love was granted permission to file a corrected amended complaint correcting typographical errors in the Amended Complaint.  References to the Love Amended Complaint are to the corrected amended complaint.)

[4]The court has reviewed the evidence, and all factual inferences arising from it, in the light most favorable to the nonmoving party.

3

Before joining the City Law Department, Love worked in general practice both with a law firm and as a sole practitioner. (Love Depo. at 21-23). In the City Law Department, Principal Attorneys are more experienced than Senior Attorneys and handle leadership roles in matters assigned to them. (Hughes Depo., Vol. 1, at 84). Within the structure of the City Law Department, "Attorney" is the lowest position, "Senior Attorney" is the mid-level position, and "Principal Attorney" is the highest position for merit employees other then Assistant City Attorney and City Attorney. (Love Depo. at 336-37).

Hughes and Love contend that they initially sought employment as Principal Attorneys, but that at the time they were hired, Assistant City Attorney Bill Pate ("Pate"), told them that, due to the pendency of a race discrimination case against the City by an African-American attorney named Debra Montgomery, the City could not hire them as Principal Attorneys and could not pay them the salary to which they would otherwise be entitled as Principal Attorneys. (Love Depo. at 38-40; Hughes Depo., Vol. 1, at 35-37, 38-41, 43). Hughes and Love then applied for Senior Attorney positions. (Love Depo. at 42; Hughes Depo., Vol. 1, at 61-62). Hughes and Love ultimately were hired by the City on January 18, 1998, as Senior Assistant City Attorneys.[5] (Hughes Verified Complaint, ¶ 7; Love Amended Complaint, ¶ 7). Hughes and Love allege that they were informed that when the Debra Montgomery case was resolved, their respective salaries would be adjusted

---

[5]Hughes and Love were hired during the time that City Attorney Demetrius Newton ("Newton") was in office. (Hughes Verified Complaint, ¶ 8; Love Amended Complaint, ¶ 8). They were placed at pay Grade 30, Step 3, with a corresponding salary of approximately $49,000. (Powell Affidavit, Exhibits A and B.) Accordingly, Love and Hughes each were initially paid $1,922.40 biweekly or $49,982.40 annually until January 16, 1999, when both Love and Hughes received a merit increase to $2,017.60 biweekly or $52,457.60 annually. On July 3, 1999, both Love and Hughes again received pay increases to $2,057.60 biweekly or $53,497.60 annually. (*Compare* Exhibits A and B to the Powell Affidavit).

upward to the Principal Attorney level at which each claim they should have been initially hired. (Hughes Verified Complaint, ¶ 8; Love Amended Complaint, ¶ 8; Hughes Depo., Vol. 2, at 36-37; Love Depo. at 41).  Both Love and Hughes concede, however, that there was never any discussion about the specific grade and step level to which they would be adjusted.  (Love Depo. at 42-43, 48-52, 56-57; Hughes Depo., Vol. 1, at 35-38).

Love and Hughes were not promoted to the Principal Attorney[6] position under then City Attorney Demetrius Newton ("Newton").  (Powell Affidavit, Exhibits A and B; Love Depo. at 70; Hughes Depo., Vol. 1, at 64-65).  Bernard Kincaid was elected the new Mayor of the City in November 1999, before the Debra Montgomery case was resolved.  (Hughes Verified Complaint, ¶ 9; Love Amended Complaint, ¶ 9; Hughes Depo., Vol. 1, at 65; Johnson Depo. at 25).  After the 1999 Mayoral election, Love and Hughes went to see Newton to express their concerns that, even though the Montgomery case was unresolved, they wanted to make sure that their salary adjustments did not get lost in the change of administrations.  (Hughes Depo., Vol. 1, at 70-71).  According to Hughes and Love, Newton shared their concern and discussed the situation with the City Personnel Director, Gordon Graham ("Graham").  (Hughes Depo., Vol. 1, at 70-72).  Graham, however, felt that this was an issue more appropriately left to the new mayoral administration and City Attorney. (Hughes Depo., Vol. 1, at 71-72).

By early January 2000, Pate and Newton had resigned their positions and had been replaced with Tamara Harris Johnson as City Attorney and Theo Lawson ("Lawson") as her Chief Deputy. (Hughes Depo., Vol. 1, at 72).  In January 2000, Mayor Kincaid appointed Johnson as City Attorney

---

[6]As discussed in more detail below, promotion to Principal Attorney requires the approval of both the City Attorney and the Mayor, as well as the JCPB.  (Love Depo. at 102).

for his administration.[7]  (Hughes Verified Complaint, ¶ 9; Love Amended Complaint, ¶ 9; Hughes

Depo. at 65).  At the time Johnson was appointed, Hughes was handling claims that turned into

litigation matters or were resolved prior to litigation, contract issues, bankruptcies, garnishments,

and litigation matters that dealt with accidents.  (Johnson Depo. at 35-36).  In January 2000, Johnson

approved merit pay increases for both Love and Hughes,[8] raising their salaries to $2,161.60 biweekly

or $56,201.60 annually.  (Powell Affidavit, Exhibits A and B).

In order for a member of the City Law Department to obtain a promotion, the City Attorney

must first make a recommendation to the Appointing Authority (the Mayor) who then makes a

recommendation to the JCPB, which must then vote to approve the promotion.  (Johnson Depo. at

40-41; Love Depo. at 101).  Johnson told Love and Hughes to put their names in for the two vacant

Principal Attorney positions.  (Johnson Depo. at 37-38).  Johnson asked Hughes at least twice to get

his name on the JCPB list for the position of Principal Attorney.  (Hughes Depo., Vol. 1, at 88;

Hughes Depo., Vol. 2, at 166-68).  Hughes and Love's names were subsequently identified on an

open register of eligible applicants for the position of Principal Attorney.  (Johnson Depo. at 38,

290).  Principal Attorneys are paid at a grade level 34.  (Johnson Depo. at 42).  An open register

identifies applicants eligible for hire in a specific job classification and anyone who is eligible can

apply for that position, whether he or she is an employee of the City.  (Johnson Depo. at 292).  After

---

[7]Hughes concedes that Johnson bears no responsibility for he and Love having been hired as Senior Attorneys at Grade 30, Step 3.  (Hughes Depo., Vol. 2, at 136).  Their salary level was set at the time they accepted the position (Johnson Depo. at 289-90), and Johnson did not determine Hughes's salary at the time she became City Attorney.  (Hughes Depo., Vol. 2, at 136).

[8]Obviously, Hughes attributes no discriminatory motives to Johnson in her approval of his merit increase in January 2000.  (Hughes Depo., Vol. 2, at 32).

their names were listed on the register, Johnson interviewed Hughes and Love and selected them both for promotion from the list of available candidates.  (Johnson Depo. at 38-40).

After selecting the applicants from the open register, the City Attorney then recommends the appointment of the applicants to the Mayor, who approves the applications.  (Johnson Depo. at 41).  In May 2000, upon the written recommendation of Johnson, the approval of Mayor Kincaid, and the approval of the JCPB, Hughes and Love were promoted to Principal Attorney at Grade 34, Step 2.[9] (Hughes Depo., Vol. 1, at 85-86; Love Depo. at 100; Powell Affidavit Exhibits A and B).  On May 20, 2000, Johnson gave Hughes and Love a one-step promotion from Senior Attorney, Grade 30, Step 5, to Principal Attorney, Grade 34, Step 2, which increased their pay to $2,269.60 bi-weekly or $59,009.60 annually.  (Powell Affidavit, Exhibits A and B).  As Johnson understood the rules of the JCPB, when Hughes and Love were promoted to Principal Attorney, they were promoted to one step above whatever their base salary grade had been.  (Johnson Depo. at 42).

At all times relevant to this litigation, Rule 2.13 of the JCPB Rules and Regulations ("JCPB Rules") stated as follows:

> Each Employee in the classified service shall be paid at one of the rates set forth in the Pay Plan for the classification in which he serves, in accordance with these Rules and the special provisions for administering the Pay Plan.
>
> (a)   MINIMUM RATE. New appointments to the classified service shall be made at one of the beginning rates (step 1, 2, or 3) of the salary range for the classification to which the appointment is made.  A new appointment at step 2 or step 3 of the salary rate shall be based on outstanding education and/or experience qualifications of the candidate.

---

[9]Both Hughes and Love were hired as Principal Attorneys from an open register, meaning that anyone who was qualified could apply for that position.  (Johnson Depo. at 205).

(b)    If an employee is appointed within the same jurisdiction by open-competitive exam in a related occupational class, the employee's new rate shall be set to allow a one-step increase above the new employee's former base rate or the new rate shall be the entrance rate for the new classification.  The appropriate alternative is to apply the highest possible increase.

(c)    The Personnel Board, may upon recommendation of the Director, authorize appointment above the step 3 salary rate when:

    (1)    There is a lack of available candidates for recruitment at step 3 salary rate.

    (2)    A former, satisfactory employee is re-employed in the classification he formerly held.

    (3)    The appointing authority recommends appointment above the step 3 salary rate, based on outstanding education and/or experience qualifications of the candidate and the position to be filled is that of a Department Head, Deputy Department Head, or high-level professional or administrative position.

(d)    <u>SALARY ADVANCEMENT.</u> Salary advancement within established salary ranges shall be based on meritorious performance on the job and shall be in accordance with the special provisions for administering the Pay Plan.   An efficiency rating reflecting satisfactory performance shall be required for advancement.  Advancement from the first to the second step in the range shall be allowed a full-time, regular employee (<u>trainees are not included</u>) after the completion of one (1) year of satisfactory service.  An employee with continued satisfactory service shall be eligible for future annual increases until such time as the maximum rate for the range is reached.

(e)    <u>SALARY RATE IN PROMOTION, TRANSFER OR DEMOTION.</u> In the event a classified employee is promoted, transferred or demoted, his rate of pay for the new position shall be determined as follows:

    1.    <u>PROMOTION.</u> Upon promotion, the incumbent's regular base pay shall determine the new rate in the promotional class.  The new rate shall be set to (a) allow one step increase above the former base rate, or (b) the new rate shall be the entrance rate for the promotional class, and whichever increase is greater shall be applied.

8

2.      DEMOTION.  When an employee is demoted, his compensation shall be reduced to the salary prescribed for the class and/or grade to which he was demoted.  The particular rate shall be determined by his period of employment in the classified service.  In no event shall his salary exceed the maximum rate of the new classification.

3.      TRANSFER.  When an employee is transferred from one department to another or from one jurisdiction and/or government to another, his step in the pay range remains unchanged.  Transfer shall mean the governmental movement of an incumbent, who has not retired, resigned, or whose employment had not been otherwise terminated, within a class or between two separate but related classes for which the maximum pay steps for those classes are equal.  All transfers must be approved by the appointing authorities concerned and the Director Personnel.

(Hughes Depo., Vol. 1, at 67 and Exhibit 1; Love Depo. at 121 and Exhibit 2; Johnson Depo. at 56-57).  JCPB Rule 2.13(e)(1) addresses what authority the City Attorney has to increase pay when an attorney who is already employed in the department receives a promotion.  (Johnson Depo. at 56-57).  At the time of their promotion to Principal Attorney, Patty Powell, Executive Secretary to Johnson, advised Hughes that under the JCPB Rules, they could only be promoted one step.[10]  (Hughes Depo., Vol. 1, at 86).

On July 1, 2000, Hughes and Love both received a 3% general pay raise, resulting in a pay increase to $2,337.60 bi-weekly or $60,777.60 annually.  (Powell Affidavit, Exhibits A and B).

---

[10]When Johnson came into office, Hughes and Love asked Johnson if they could be considered for several steps higher than the one-step promotion permitted by JCPB Rule 2.13. (Hughes Depo., Vol. 1, at 68-69).

On August 30, 2000, Johnson hired Ted Smith ("Smith") as a Principal Attorney to replace Charlie Wyatt, who was deceased.[11] (Powell Affidavit, Exhibit C). Based upon his prior experience, Johnson recommended that Smith be appointed at a compensation level of Grade 34, Step 6, which paid $2,838.40 biweekly, or $73,798.40 annually. (Powell Affidavit, Exhibit C). Smith is an African-American male. (Hughes Depo., Vol. 1, at 75-76, 104; Powell Affidavit, Exhibit C).

On May 19, 2001, Hughes and Love received merit increases from Grade 34, Step 2 to Grade 34, Step 3, increasing their pay to $2,451.20 bi-weekly and $63,731.20 annually. (Powell Affidavit, Exhibits A and B). During the Spring or Summer of 2001, Hughes and Love saw a newspaper article that published the salaries of attorneys employed in the City Law Department, including Smith's salary. (Hughes Depo., Vol. 1, at 74, 104; Love Depo. at 110-11). After seeing the published list of salaries, Hughes and Love talked to Johnson about their pay. (Love Depo. at 113, Hughes Depo., Vol. 1, at 76). Both Love and Hughes told Johnson they should be earning salaries at least equal to what Smith was being paid. (Hughes Depo., Vol. 1, at 94-95). They also asked Johnson to recommend an increase sufficient to raise their pay to a rate equivalent to the salary paid Smith, which would have required a multi-step advancement of between two and five steps. (Hughes Depo., Vol. 1, at 94-95). Johnson told Love and Hughes that within the confines of the JCPB Rules, she would do what she could to try to get a multi-step increase for both of them. (Johnson Depo. at 149-50).

In approximately May 2001, Love told Johnson that an official of the JCPB, Greg James ("James"), had told him that a multi-step increase was permitted under the JCPB Rules. (Johnson

---

[11]Smith supervises municipal court prosecutors and handles employment cases through the administrative process and litigation and handles some personnel board work. (Johnson Depo. at 72-75; Powell Affidavit, Exhibit C).

Depo. at 59).  With Love in her office, Johnson phoned James.  (Johnson Depo. at 120).  James indicated to Johnson that a multi-step increase under JCPB Rule 2.13 (c)(3) could be recommended. (Johnson Depo. at 58-59, 120-21, 151).  Although Johnson asked James to put his interpretation of JCPB Rule 2.13(c)(3) in writing, James never did.  (Johnson Depo. at 154).  As City Attorney, Johnson has never recommended more than a one step increase be given when an employee was promoted from an open register.  (Johnson Depo. at 289-90).

During the course of their conversation, Johnson told Love she wanted to promote Love but not Hughes.[12]  (Love Depo. at 136).  But, according to Love, he told Johnson she could not do that because such a personnel action would constitute "discrimination."  (Love Depo. at 136).  Johnson also told Love that she knew what Love did and he did a lot of work with which she was satisfied, but she did not know what Hughes did and what his assignments were.  (Love Depo. at 136-37). Love told Johnson that "Charles [Hughes] and [he were] tied at the hip on this."  (Love Depo. at 136).  Johnson then looked at Love as if she was angry and he left.  (Love Depo. at 136).

In late May 2001, Johnson asked Love and Hughes to provide her information concerning their respective assignments and caseloads for use in a letter to the Mayor recommending the multi-step increase.  (Love Depo. at 135-36;  Hughes Depo., Vol. 1, at 100, 111-13; Johnson Depo. at 113-14, and Exhibit 8).  Love responded to this request by providing Johnson a description of his work assignments and job responsibilities.[13]  (Johnson Depo. at 117; Love Depo. at 139-40).  On May 31, 2001, Johnson sent a letter to Mayor Bernard Kincaid recommending a multi-step salary increase for

_____

[12]Johnson emphatically denies that such a conversation ever took place. However, on summary judgment the court must view the facts in the light most favorable to the non-moving party. This of course does not mean, however, that the City concedes any such fact to be true.

[13]As noted *infra*, Hughes responded to this request for information on June 4, 2001.

Love from Grade 34, Step 3 to Grade 34, Step 6. (Johnson Depo. at 59, and Exhibit 9; Hughes Depo., Vol. 1, at 99 and Exhibit 6; Love Depo. at 143, Exhibit 6).

After Johnson sent her May 31, 2001 letter to the Mayor, she discussed JCPB Rule 2.13(c)(3) with Graham. (Johnson Depo. at 121-22, 197). Graham told Johnson that James's interpretation of the Rule (permitting a multi-step pay increase) was incorrect and that Johnson's original interpretation was accurate. (Johnson Depo. at 121-22). Johnson also learned that the former Director of Personnel of the JCPB, Ben Payton, had stated that such a multi-step increase was not permitted under the Rules. (Johnson Depo. at 198). After speaking to Graham, Johnson withdrew her May 31, 2001 letter of recommendation until she could get clarification from the JCPB. (Johnson Depo. at 123-24, 193-94). At the time Johnson withdrew her May 31, 2001 letter, the Mayor had not acted upon it. (Johnson Depo. at 193-94).

Hughes responded to Johnson's request for information on June 4, 2001, but by then Johnson had already withdrawn her May 31, 2001 letter. (Johnson Depo. at 118-19). Even though Johnson's May 31, 2001 letter to the Mayor recommended a raise for Love only (*i.e.*, not Hughes),[14] Love never received any pay raise that Hughes did not also get. (Love Depo. at 326). The City's treatment of both Hughes and Love with regard to the pay increase issues has been the same throughout. (Love Depo. at 326).

Love called the Mayor in May 2001 to discuss the multi-step pay increase. (Love Depo. at 146-49). According to Love, the Mayor stated that there was "no way in hell" that he was going to let "you all" jump over other people in the law department. *Id.*

---

[14]At the time Johnson sent her May 31, 2001 letter to the Mayor, Hughes had not yet responded to her request that he give her information about his assignments and caseload.

At the time the May 31, 2001 letter to the Mayor was written by Johnson, Hughes and Love were at the same step and grade level for the City of Birmingham.  (Hughes Depo., Vol. 1, at 116). Moreover, at the time of Hughes's deposition on October 15, 2003, Hughes and Love were still at the same step and grade for the City.[15]  (Hughes Depo., Vol. 1, at 116).  Both were paid less than Smith.

In early June 2001, Hughes retained John Falkenberry ("Falkenberry") as legal counsel to represent him in the dispute arising out of his pay rate.  (Johnson Depo. at 111-12).  On June 12, 2001, Falkenberry sent Johnson a letter advising the City of his representation of Hughes in the salary dispute.  (Johnson Depo. at 111).

The City retained Attorney James Alexander ("Alexander") of the law firm of Bradley, Arant, Rose & White to represent it in the Hughes salary dispute.  (Johnson Depo. at 145-46; Hughes Depo., Vol. 1, at 146).  Johnson told Alexander that she had no problem in recommending a multi-step increase if it was allowed by the JCPB Rules, but she needed something in writing to show that either her interpretation of the rule as prohibiting multi-step increases was incorrect or there was another rule that she had not considered.  (Johnson Depo. at 154-55).

On April 1, 2002, Alexander sent Falkenberry the following email:

> I have had difficulty catching up with Tamara between her schedule and mine.  We did, however, talk earlier today.  Tamara tells me that the JEFCO PB took the position earlier that step increases were inappropriate.  Tamara wants a letter from the PB saying that it will approve this increase sought.  She will then submit the request which will require the Mayor's approval.

---

[15]On June 30, 2001, Hughes and Love received a 6% general increase for City of Birmingham employees, raising their salaries to $2,598.40 bi-weekly and $67,558.40 annually.  (Powell Affidavit, Exhibits A and B).

> I think also that Tamara will also submit the same recommendations for James Love.
>
> I am about to get out of the country for a week and would like to discuss on Tuesday.

(Love Depo. at 186-87 and Exhibit 8; Hughes Depo., Vol. 1, at 147 and Exhibit 9).  Johnson contends Alexander misunderstood her and that what she actually wanted was a letter from the JCPB indicating its position that her interpretation of the rule as prohibiting multi-step increases was incorrect or there was another rule that she had not considered.  (Johnson Depo. at 209-10).

Hughes and Love then drafted a letter to James, in which they described what they were seeking from the JCPB.  (Hughes Depo., Vol. 1, at 171-72).  Subsequently, Hughes had a conversation with James in which he (James) advised that he needed more information than was provided in the letter Hughes and Love sent him.  (Hughes Depo., Vol. 1, at 172).

Falkenberry prepared a document entitled Settlement Agreement and Release.  (Hughes Depo., Vol. 1, at 150-52, 174-76 and Exhibit 10).  The Settlement Agreement and Release provided that Love and Hughes would receive a multi-step increase of four steps followed by one additional step at their next annual merit increase in June 2002.  (Hughes Depo., Vol. 1, Exhibit 10).  Hughes and Love delivered the Settlement Agreement and Release to James.  (Hughes Depo., Vol. 1, at 177-78).  Johnson was never consulted about the Settlement Agreement and Release.  (Johnson Depo. at 157-58).  Alexander, the City's attorney, testified at the JCPB hearings held with respect to Hughes (July 23-24, 2002) and Love (September 3, 2002) that he did not see or learn about the settlement agreement until after the May 7, 2002 JCPB hearing, and he had no knowledge of or participation in drafting or preparing it.  (Personnel Hearing of Charles Hughes at 126-28, 136;

Personnel Hearing of James Love at 110-11, 121-22, 135).  Johnson never authorized a five-step increase to Grade 34, Step 8.  (Love Depo. at 173-75).

James asked that the document labeled Settlement Agreement and Release be provided to Charlie Waldrep ("Waldrep"), counsel for the JCPB at the time.  (Hughes Depo., Vol. 1, at 178). Love and James met with Waldrep (Hughes Depo., Vol. 1, at 179; Love Depo. at 194-95), and the Settlement Agreement and Release related to Hughes and Love was placed on the JCPB's May 7, 2002 meeting agenda by Waldrep.  (Hughes Depo., Vol. 1, at 182-83).

At the May 7th meeting, the JCPB approved the Settlement Agreement and Release as it related to Love.  (Hughes Depo., Vol. 1, at 214).  The JCPB did not vote on the Settlement Agreement and Release as it applied to Hughes because Falkenberry's law partner at the time, Robin Burrell, sat on the JCPB and that created a conflict.  (Hughes Depo., Vol. 1, at 153-54, 205-08). During the JCPB meeting, Hughes called the City Law Department and asked Assistant Attorney John Edens to waive the conflict on behalf of the City.  (Hughes Depo., Vol. 1, at 207-08, 213). Edens refused to do so.  (Hughes Depo., Vol. 1, at 207-08).

No one in the City Attorney's office, the Mayor's office, or the Birmingham Personnel Department approved any settlement on behalf of either Hughes or Love.  (Hughes Depo., Vol. 1, at 220-21).  No one from the City was involved in reviewing, drafting or negotiating the terms of the Settlement Agreement and Release.  (Love Depo. at 192-93).  On May 10, 2002, after learning of the JCPB's approval of the Settlement Agreement and Release as it related to Love, Johnson wrote James and requested that the JCPB immediately rescind its approval of the Love Settlement

Agreement.[16]  (Love Depo. at 213, Exhibit 13).  The JCPB subsequently rescinded its approval of

the Settlement Agreement as it related to Love.  (Johnson Depo. at 203).

On May 17, 2002, Johnson drafted a Notice of Determination Hearing advising Hughes and

Love that they were subject to discipline for having engaged in activity which violated the JCPB's

Rules.  Hughes and Love subsequently were suspended and placed on administrative leave for

violation of the following JCPB Rules:

> (1)     6.2(c)  Conduct unbecoming an employee in the public service; and/or
>
> (2)     6.2(p)  For any other reason deemed to be in the best interest of public
>                 service and not inconsistent with the rules and regulations arising
>                 therein.

(Love Depo. at 231, and Exhibit  9; Hughes Depo., Vol. 1, at 223, and Exhibit 17).

On May 21, 2002, Hughes filed an EEOC charge alleging retaliation and referenced the May

17, 2002 notice of determination hearing that he had received.[17]  On that same date, Hughes also

filed his lawsuit in this court.  (Doc. #1).

On May 22, 2002, at the request of Johnson and with the approval of the Mayor, Lawson

conducted separate determination hearings for Hughes and Love.  On May 23, 2002, Lawson

recommended that Love and Hughes both be dismissed effective May 24, 2002.  (Hughes Depo.,

---

[16]Love and Hughes contend that the document entitled Settlement Agreement and Release
was in fact a proposed document to be used to obtain the blessings of the JCPB in order that Johnson
might then recommend a multi-step salary increase to the Mayor.  (Love Depo. at 177-80; Hughes
Depo., Vol. 1, at 150-51).  Hughes and Love raised the same issues and had the same concerns
regarding their pay.  (Love Depo. at 302-03).

[17]While the EEOC charge indicates that the notice of determination was sent to Plaintiff on
May 16, 2002, the date on the document is May 17, 2002.

Vol. 1, at 232-33; Hughes Depo., Vol. 2, at 66-7, and Exhibit 18 at 2; Love Depo. at 229, 232).  Love and Hughes were discharged.

After Hughes and Love were dismissed, their case assignments were given to Sonny Bass to log in, then Assistant City Attorneys Mike Melton and Thomas Bentley were to review the cases and divide them so that there would be a smooth transition of the work assignments.  (Johnson Depo. at 179-80).

Subsequent to being discharged, Hughes and Love appealed to the JCPB.  (Hughes Depo., Vol. 1, at 234; Hughes Depo., Vol. 2, at 71; Love Depo. at 232-33).  The JCPB can overrule the City Attorney and Deputy City Attorney on decisions pertaining to promotion, transfers or pay increases.  (Love Depo. at 317-18).  The JCPB ruled in favor of both Hughes and Love and reinstated them to their employment.  The City appealed to a three-judge panel of the Circuit Court of Jefferson County.  (Hughes Depo., Vol. 1, at 235-36; Love Depo. at 232-33).  However, the panel affirmed JCPB's decision to reinstate Hughes and Love.  (Hughes Depo., Vol. 1, at 235-36; Love Depo. at 232-33).

Hughes returned to work in October 2002 and received full back pay for his time off from work.  (Hughes Depo., Vol. 1, at 236-37; Hughes Depo., Vol. 2, at 71-2).  Hughes is not raising issues of back pay in his lawsuit.  (Hughes Depo., Vol. 1, at 237).  Love also returned to work.  Upon their return, Love and Hughes[18] received full restoration of their benefits.

Prior to his involuntary separation, Hughes defended civil litigation in state and federal courts.  (Hughes Depo., Vol. 1, at 240-41).  Upon his reinstatement and return to the City Law Department, Hughes was assigned to a position as the prosecutor in the City Jail.  (Hughes Depo.,

---

[18]For obvious reasons, Hughes has not been paid for certain costs (relating to his dental and health insurance and his law license), which Hughes has yet to submit to the City for reimbursement.  (Love Depo. at 236-37; Hughes Depo., Vol. 1, at 237-40; Hughes Depo., Vol. 2, at 71-72).

Vol. 2, at 41).  Michael Fliegel ("Fliegel"), Assistant Attorney for the City, had been responsible for the prosecutor's job at the jail to which Hughes was assigned.  (Hughes Depo., Vol. 1, at 55; Hughes Depo., Vol. 2, at 39).  Fliegel vacated his job as prosecutor at the jail when his military unit was called up for service in Iraq (Hughes Depo., Vol. 2, at 41-42), and Hughes in effect took Fliegel's position at the jail.  (Hughes Depo., Vol. 2, at 151).  Hughes believes that as a consequence of his having exercised federally protected rights, Johnson sent him to the jail to be a prosecutor and also tried to make him become a collection lawyer.  (Hughes Depo., Vol.1, at 53-55; Hughes Depo., Vol. 2, at 130-31).  With respect to his reassignment to the jail, Hughes claims that the position is detrimental to him because he is not practicing law like a lawyer should, he is working with the poorest of the poor, and he is prosecuting in a dangerous place.  (Hughes Depo., Vol. 1, at 55, 250).  Hughes believes that his predecessor attorneys who were placed at the jail as prosecutors were lawyers who had fallen into disfavor.  (Hughes Depo., Vol. 2, at 115).  City Attorney Charlie Wyatt worked at the jail as a prosecutor prior to the time that Hughes worked there.  (Hughes Depo., Vol. 2, at 115-16).

Hughes concedes he has suffered no loss in pay as a result in his job reassignment.  (Hughes Depo., Vol. 1, at 244).  As a member of the City Law Department, Hughes does not claim any entitlement to practice in a certain area or to do a certain type of litigation work (Hughes Depo., Vol. 1, at 130), and recognizes the City Attorney's right to assign or reassign job responsibilities depending on the immediate needs of the office.  (Hughes Depo., Vol. 1, at 33-34, 130; *see* Johnson Depo. at 184, 215).

Johnson asked Hughes and another attorney with the City, Sonny Bass, to evaluate collections at the City and make recommendations about what could be done to better handle City

collection work.  (Hughes Depo., Vol. 2, at 141-43).  Hughes and Bass recommended that City collection work be outsourced; their suggestion was accepted.  (Hughes Depo., Vol. 2, at 143-44). Prior to this decision to outsource City collection work, Johnson emailed Hughes to inform him that he would be taking over collections.  (Hughes Depo., Vol. 2, at 144).  Hughes refused to do the City collection work, but Johnson did not take any disciplinary action.  (Hughes Depo., Vol. 2, at 144; Johnson Depo. at  215-216).  Hughes never assumed the collection responsibilities for the City.[19] (Hughes Depo., Vol. 2, at 141).

Similarly, Love's job duties and responsibilities changed upon reinstatement.  Prior to his separation, Love had litigation as well as non-litigation responsibilities.  (Love Depo. at 89). Following his reinstatement, Love was reassigned to work with the City's Park Board, a non-litigation assignment.  (Love Depo. at 89-90).  Love presently reports to Smith, who serves as his immediate supervisor.[20]  (Love Depo. at 225).

The City Law Department occupies the sixth and second floors of City Hall.  (Johnson Depo. at 137).  The City Law Department has fifteen to twenty lawyers, six of whom have an office on the

---

[19]At the time Johnson asked Hughes and Bass to evaluate the City collections situation, Hughes, Bass and Fliegel had the most collections experience in the City Law Department.  (Hughes Depo., Vol. 1, at 147-48).  To the extent that the City has collection work presently, it is handled by attorneys Malera Trayor-Wright and Michael Fliegel.  (Johnson Depo. at 129).

[20]Love asserted that he was not properly treated by the City upon his reinstatement because: (a) the City would not allow him access to his personal property located on the sixth floor; (b) the City removed him from his sixth floor office and "kind of segregated [him] downstairs;" (c) he did not have a telephone in his office for some months; (d) the City failed to provide him with a computer and a printer within a reasonable time; and (e) he was not reassigned to his pre-termination cases and general assignments.  (Love Depo. at 238-40).

second floor of City Hall.  (Love Depo. at 254).  As City Attorney, Johnson determines office

assignments in the Law Department.  (Love Depo. at 249).[21]

Upon their reinstatement, both Love and Hughes were assigned to different offices than those

they had occupied before their discharge.  Love's office prior to his separation was on the sixth floor

of City Hall.  (Love Depo. at 249; Johnson Depo. at 187).  Jeff Gilliam, an attorney in the City Law

Department, was placed in the office which Love occupied before his discharge.  (Johnson Depo.

at 136; Love Depo. at 256).  After he was reinstated, Love was provided an office on the second

floor of City Hall.  (Love Depo. at 251; Johnson Depo. at 187-88).  The second floor office is of

comparable size to the sixth floor office.  (Love Depo. at 258-59).  Before he was terminated,

Hughes's office was on the sixth floor of City Hall. (Johnson Depo. at 135, 137).  Jim Stanley, an

attorney in the City Law Department, is now in the office which Hughes occupied before he was

dismissed.  (Johnson Depo. at 136).

Since being reinstated to the City Law Department, Hughes and Love have received the same

annual step increases and pay raises.  (Hughes Depo., Vol. 1, at 244-45; Powell Affidavit, Exhibits

A and B).  Hughes does not contend that Love has been treated better or worse than Hughes with

regard to his employment.  (Hughes Depo., Vol. 2, at 119).  Hughes contends that Smith is his only

comparator for purposes of his lawsuit.[22]  (Hughes Depo., Vol. 2, at 120, 126).  Smith earned a

Master's Degree in Public Administration.  (Love Depo. at 315; Powell Affidavit, Exhibit C).

---

[21]Love, Ted Smith, Jucinda Anderson, Karen McLain, Michael Fliegel and Rosalyn Smith Simon have offices on the second floor.  (Love Depo. at 253-54).

[22]Hughes's basis for believing that Smith received a multi-step increase while an incumbent for the City is based on a letter about Smith from Johnson to the Mayor and no other personnel information.  (Hughes Depo., Vol. 2, at 122-23).

20

Hughes does not have a master's degree.  (Love Depo. at 14-15, 315; Hughes Depo., Vol. 1, at 13-15).  Smith supervises municipal court prosecutors.  (Hughes Depo., Vol. 2, at 50-1; Powell Affidavit, Exhibit C).  Hughes does not.

Johnson has never said anything to Hughes that would lead Hughes to believe that she would (1) discriminate on the basis of race (Hughes Depo., Vol. 2, at 128); or (2) retaliate against a subordinate on the basis of him having exercised federally protected rights.  (Hughes Depo., Vol. 2, at 128-29).

Through his lawsuit, Hughes seeks to be reassigned to the job assignments he had prior to his termination, get his old office back, receive a retroactive salary step increase to the level of Smith, and be awarded compensatory and punitive damages.  (Hughes Depo., Vol. 2, at 173-74). Hughes also requests that the City be required to replace the form files that he had prior to his termination.  (Hughes Depo., Vol. 2, at 180).

## III.    Standard of Review

Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R .Civ. P. 56(c).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

A plaintiff in an employment discrimination case maintains the ultimate burden of proving that the adverse employment decision was made because of intentional discrimination.  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000); *St. Mary's Honor Center v. Hicks*, 509

U.S. 502, 509-12 (1993); *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1184 (11th Cir. 1984). Although the Supreme Court previously established the basic allocation of burdens and order of proof in a disparate treatment case, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981), as modified by *Desert Palace v. Costa*, 539 U.S. 90 (2003), that allocation scheme applies only in cases where there is no direct evidence of discrimination, *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 595 (11th Cir. 1987).

Under the *McDonnell Douglas/Burdine* scheme, a plaintiff first has the burden of proving by a preponderance of evidence a *prima facie* case of discrimination. Second, once the plaintiff proves a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision. Finally, if the defendant carries its burden, the plaintiff must *either* prove by a preponderance of the evidence that the legitimate reasons offered by the defendant are merely a pretext for discrimination *or* present sufficient evidence, of any type, for a reasonable jury to conclude that discrimination was a "motivating factor" for the employment action, even though defendant's legitimate reason may also be true or have played some role in the decision. *McDonnell Douglas Corp.*, 411 U.S. at 802-05; *Burdine*, 450 U.S. at 252-54; *Desert Palace*, 539 U.S. at 101-02.

## IV.    Discussion

### A.    Plaintiff is Not Entitled to Issue Preclusion

As an initial matter, in addressing Plaintiff's remaining claims and his motion for summary judgment, the court must determine whether the decision by the JCPB, which was upheld by a panel of judges of the Jefferson County Circuit Court, and which reinstated Hughes to his prior position,

precludes the City from relying upon certain factual information in this lawsuit.[23]  For the reasons stated below, it does not.

In a § 1983 case, a federal court considering whether to give preclusive effect to state court judgments must apply that state's law of collateral estoppel.  *Wood v. Kesler*, 323 F.3d 872, 879-80 (11th Cir. 2003); *see also, Brown v. City of Hialeah*, 30 F.3d 1433, 1437 (11th Cir. 1994).  In *Saad Construction Co., Inc. v. D.P.F. Architects, P.C.*, 851 So.2d 507 (Ala. 2002) the Alabama Supreme Court addressed the doctrine of collateral estoppel or issue preclusion:

> For the doctrine of collateral estoppel to apply, the following elements must be established: "'(1) that an issue in a prior action was identical to the issue litigated in the present action; (2) that the issue was actually litigated in the prior action; (3) that resolution of the issue was necessary to the prior judgment; and (4) that the same parties are involved in the two actions.'"  *Smith v. Union Bank & Trust Co.*, 653 So.2d 933, 934 (Ala. 1995).  "'Where these elements are present, the parties are barred from relitigating issues in a prior [action].'"  *Smith*, 653 So.2d at 934 (quoting *Lott v. Toomey*, 477 So.2d 316, 319 (Ala. 1985)).  *Biles v. Sullivan*, 793 So.2d 708, 712 (Ala. 2000).  "Only issues *actually decided* in a former action are subject to collateral estoppel."  *Leverette ex rel. Gilmore v. Leverette*, 479 So.2d 1229, 1237 (Ala. 1985) (emphasis added).  The burden is on the party asserting collateral estoppel to prove that the issue it is seeking to bar was determined in the prior adjudication.  *See Adams v. Sanders*, 811 So.2d 542, 545 (Ala. Civ. App. 2001) ("Because we have no transcript of the trial in the district court, the burden is on Sanders to show that the district court determined that he was not negligent.").  *See also United States v. Cala*, 521 F.2d 605, 608 (2d Cir. 1975) ("The burden ... is on [the one asserting collateral estoppel] to establish that the issue he seeks to foreclose from litigation in the present prosecution was necessarily decided in his favor by the prior verdict.").  The appellees have not satisfied their burdens of proof as to their affirmative defense of collateral estoppel.  As previously noted, one who claims the defense of collateral estoppel must prove, among other things, that the issue was "actually decided," *Leverette*, 479 So.2d at 1237, and "that resolution of the issue was necessary to the prior judgment," *Biles*, 793 So. 2d at 712.

*Saad Construction*, 851 So. 2d at 520 (emphasis added).

---

[23]Johnson was not a party to the proceedings before the JCPB nor in the state court action; therefore, she cannot be bound by the fact-finding in those matters.

The scope of the JCPB's findings were limited: "The Personnel Board of Jefferson County hereby finds that the charges against Hughes are not supported by the evidence. It appears to the Board that <u>Hughes's efforts to obtain approval of the subject settlement agreement were a direct result of the above communications between counsel for the parties, and not a result of improper conduct</u>." (Doc. #92, at Tab I, at 3 (emphasis added)).

Moreover, by virtue of Plaintiff's own motion in limine, which was granted by the JCPB at the beginning of the hearing, the scope of the factual issues to be litigated and resolved related solely to the question of whether "[Hughes was] guilty of conduct unbecoming based on his actions at the Personnel Board meeting that took place on May 7, 2002." (Doc. #92, at Tab III, at 14-20). Thus, although the City sought to introduce other evidence (that it believed supported a reasonable inference that Hughes had intentionally engaged in conduct inappropriate for an attorney practicing in the City Law Department), these matters were beyond the JCPB's consideration and did not form any basis of its decision. It follows, therefore, that Hughes cannot show that these other factual issues were decided favorably to him. Nor can he show that resolution of these other issues was necessary to the Board's finding, which focused solely on Hughes's conduct. Accordingly, Hughes is not entitled to issue preclusion on any issue except that his conduct was not improper, as that was the only finding made in his favor and the only finding necessary to the JCPB's ruling.[24]

---

[24]The court's ruling is further supported by what occurred at the dismissal hearing. For example, Ms. Tidwell, one of the members of the JCPB, in her opening remarks defined the scope of the case before it as "Charles L. Hughes was dismissed from his position as a principle attorney with the Birmingham Law Department effective close of business on May 24, 2002, for violation of Personnel Board Rules and Regulations 6. 2(c): Conduct unbecoming an employee in the public service, and 6. 2(p): For any other reason deemed to be in the best interest of the public service and not inconsistent with the rules and regulations arising thereunder." (Doc. #92, at Tab III, at 4:7-15).

24

### B.   The City is Entitled to Summary Judgment on Plaintiff's Claims of Unlawful Discrimination Based on Race

_____Defendants' Motion for Summary Judgment is due to be granted on Hughes's race discrimination claims because Plaintiff has failed to produce substantial evidence of any intentional discrimination. It is axiomatic that a plaintiff in a disparate treatment case such as this one must prove "intentional discrimination" in order to prevail.[25]  *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153 (2000) ("The 'ultimate question' in every disparate treatment case 'is whether the plaintiff was the victim of intentional discrimination.'") The Supreme Court has stated unequivocally that "[p]roof of discriminatory motive is critical in a Title VII disparate treatment case." *Teamsters v. United States*, 431 U.S. 324, 335-36 n. 15 (1977); *see also United States Postal Serv. v. Aikens*, 460 U.S. 711, 715 (1983); *Clark v. Huntsville City Bd. of Educ.*, 717 F.2d 525, 528-29 (11th Cir. 1983) ("discriminatory motive, purpose or animus"). The Court has also held that "discriminatory intent" in a Title VII case "means actual motive; it is not a legal presumption to be drawn from a factual showing of something less than actual motive." *Pullman-Standard v. Swint*, 456 U.S. 273, 289-90 (1982).[26]

_____

[25]Plaintiff has conceded that he had no direct evidence of discrimination. (Hughes Depo., Vol. 2, at 127:23-129:8). He likewise has conceded that he is unaware of any pattern or practice of discrimination. (Hughes Depo., Vol. 2, at 208:14-23, 209:1-22, 209:23, 210:1-7).

[26]Of course, these standards apply with equal force to Plaintiff's discrimination claims under the Equal Protection Clause, as prosecuted under 42 U.S.C. § 1983. *See Jean v. Nelson*, 711 F.2d 1455, 1486 n.30 (11th Cir. 1983) ("Although the standard of proof in Title VII cases differs from that in constitutional equal protection cases, the framework for proving a case, *i.e. prima facie* case, rebuttal, ultimate proof, is the same.") (citing *Castaneda v. Partida*, 430 U.S. 482, 495-96) ("establishing *prima facie* case requiring rebuttal in jury discrimination case").

1.      **Plaintiff cannot establish a *prima facie* case of race discrimination**

        a.      **Plaintiff can not point to any suitable comparators who were treated differently than he was**

As set forth in his brief, Plaintiff bases his claims of racial discrimination upon: 1) the pay disparity between Plaintiff and Smith and a request for an in-grade, multi-step pay increase for he and Love that was never approved and never implemented; 2) Plaintiff's discharge; and 3) Plaintiff's assignment to the jail following his reinstatement.  (Doc. # 105 at II.A.2.a.-c. at 6-7).  However, Plaintiff has failed to produce sufficient evidence that the decision-makers involved with these claims treated similarly situated employees outside his protected classification (*e.g.*, African-American or non-Caucasian individuals) more favorably than Plaintiff, and that failure is fatal to his claims.  *Jones v. Gerwins*, 874 F.2d 1534, 1542 (11th Cir. 1989); *Smith v. Monsanto Chemical Co.*, 770 F.2d 719, 724 (8th Cir. 1985), *cert. denied*, 475 U.S. 1050 (1986); *Tate v. Wayerhouser Co.*, 723 F.2d 598, 605 (8th Cir. 1983), *cert. denied*, 469 U.S. 847 (1984).  Indeed, the City's identical treatment of the one comparator who is similarly situated to Hughes, James Love, belies any inference of intentional discrimination.

Love is an African-American.  Hughes is a Caucasian.  Love and Hughes were hired at the same time and each received comparable treatment during their employment with the City.  Each was given the same pay raises and promotions.[27]  Each has received the same salary and benefits.

---

[27]The court disagrees with Plaintiff that evidence of a request for an in-grade multi-step pay increase for Love by Johnson without proof of an approval by Mayor Kinkaid (or much less proof of implementation) constitutes an adverse employment action.  Instead, the court views the request, as an inchoate employment action, because it never came to fruition, and accordingly never negatively impacted Hughes in a substantial manner.  *See Stavropoulos v. Firestone*, 361 F.3d 610, 616-17 (11th Cir. 2004) (stating that adverse employment action "must either be an ultimate employment decision or else must 'meet some threshold level of substantiality'") (citing *Bass v.*

Johnson has testified that she believed she was precluded from giving Love and Hughes a multi-step increase in pay because Jefferson County personnel policy prohibited her from providing incumbent employees more than a one-step increase. (Johnson Depo. at 42-45, 54-57). Both Love and Hughes received equivalent discipline when they were perceived to have engaged in the same misconduct under the JCPB Rules.[28]   Thus, the record reflects no material differences in treatment between Hughes, and his most appropriate comparator, Love.  Significantly, even Hughes concedes that Love was not treated better or worse than he.  (*See* Hughes Depo., Vol. 2, at 118:16-23, 119:1-15).

Beyond Love, Hughes has failed to point to any comparator similarly situated to him who was treated more favorably because of race.  The Eleventh Circuit reiterated the standard for determining whether employees are similarly situated in *Silvera v. Orange County School Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001):

> In determining whether employees are similarly situated for purposes of establishing a *prima facie* case, it is necessary to consider whether the employees are "involved in or accused of the same or similar conduct and are disciplined in different ways." *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1311 (11th Cir.) (quoting *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir.1997)), *opinion modified by,* 151 F.3d 1321 (11th Cir.1998). "The most important factors in the disciplinary context . . . are the nature of the offenses committed and the nature of the punishments imposed." *Id.* (citations and quotations omitted). In order to satisfy the similar offenses prong, the comparator's misconduct must be nearly identical to the plaintiff's in order "to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *See Maniccia v. Brown*, 171 F.3d 1364, 1368-69 (11th Cir.1999) (citations omitted).

---

*Board of County Comm'rs, Orange County, Fla.*, 256 F.3d 1095, 1118 (11th Cir. 2001) (internal quotations omitted)).

[28]The decision to discharge Hughes for what was believed to be his misrepresentations to the JCPB does not form a basis of his retaliation claim against Johnson.  It is undisputed that Johnson delegated her authority to impose discipline upon Hughes and Love to her Deputy Chief, Theo Lawson, and that Lawson made the decision to terminate Hughes and Love independent of any influence from Johnson.  (*See e.g.*, Hughes Depo., Vol. 2, at 139:5-23, 140:1-9).

244 F.3d at 1259.  In other words, to meet the comparability requirement, Plaintiff must show that

he is "similarly situated in *all relevant aspects* to the non-minority employee." *Silvera*, 244 F.3d at

1259 (citing *Holifield*, 115 F.3d at 1562) (emphasis added).  He must demonstrate that the alleged

misconduct of the comparator was "nearly identical" to that misconduct in which he engaged.  *Nix*,

738 F.2d at 1185.

Hughes complains that Smith was hired in at a rate of pay substantially greater than what he

or Love received.  Although Hughes points to Smith as an appropriate comparator on the issue of

pay disparity (Hughes Depo., Vol. 2, at 120:12-23, 121:1-17), that assertion is misplaced for several

reasons.

Hughes was hired by a different City Attorney (Newton, rather than Johnson),[29] at a different

time (January 1998, rather than August 2000), to a different position (Senior Attorney, rather than

Principal Attorney), under a different Mayor (Arrington, rather than Kincaid), and with different

personnel rules in place.[30]  The relevant personnel rules which governed the flexibility that a City

Attorney could exercise when recommending pay increases for incumbent employees (as

distinguished from new outside hires) – *i.e.*, JCPB Rule 2.13(e)(1), rather than JCPB Rule

2.13(c)(3)).  Moreover, the purposes for which the two employees were hired were completely

different, as were the qualifications of the candidates (Hughes was hired as a general litigator, while

_____

[29]Hughes admits that Johnson bears no responsibility for the level of his pay either at the time
of his initial hiring, or at the time she became City Attorney in January 2000.  (Hughes Depo., Vol.
2, at 136:18).

[30]As other courts have recognized, "different employment decisions concerning different
employees, made by different supervisors, are seldom sufficiently comparable to establish a *prima
facie* case of discrimination for the simple reason that different supervisors may exercise their
discretion differently."  *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 618 (7th Cir. 2000).

Smith was hired to supervise municipal prosecutors and prosecute appeals to Circuit Court; Hughes possessed no advanced degrees beyond his Juris Doctor, while Smith had earned a Master's Degree in Public Administration).  (*See* Powell Affidavit, Exhibit C and Hughes admissions at Hughes Depo., Vol. 2, at 120:12-23, 121:1-17, 193:3-11).

### b.    Plaintiff's other complaints do not constitute adverse employment actions

Hughes's only other complaints are: (1) that he was almost assigned some collection duties; and (2) that after his reinstatement he was reassigned to perform legal duties at the jail.  (*See* Hughes Depo., Vol. 2, at 203:23, 204:1-23, 205:1-23, 206:1-3).[31]  These assertions similarly are off the mark because neither constitutes an adverse employment action.

To be considered an adverse employment action, "the action must either be an ultimate employment decision or else must 'meet some threshold level of substantiality.'"  *Stavropoulos*, 361 F.3d at 616-17 (citing *Bass*, 256 F.3d at 1118).  In *Wideman v. Wal-Mart,* 141 F.3d 1453, 1456 (11th Cir. 1998), the Eleventh Circuit coined the term "threshold level of substantiality" and held that Title VII's protection against retaliatory discrimination extends to certain adverse actions that fall short of an ultimate employment decision:

> Although we do not doubt that there is some **threshold level of substantiality** that must be met for unlawful discrimination to be cognizable under the anti-retaliation clause, we need not determine in this case the exact notch into which the bar should be placed. It is enough to conclude, as we do, that the actions about which Wideman complains considered collectively are sufficient to constitute prohibited discrimination. We need not and do not decide whether anything less than the totality of the alleged reprisals would be sufficient.

---

[31]Hughes actually claims that these events form the basis of his retaliation claim (Hughes Depo., Vol. 2, at 206:4-23, 207:1-2), but the court also addresses them in the context of his discrimination claims.

*Id.* (emphasis added).  Not everything, however, that makes an employee unhappy constitutes an adverse employment action.  For conduct to be considered adverse, it must materially alter the employee's compensation terms, conditions, or privileges of employment.  *Bass,* 256 F.3d at 1118. A materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities.  *Hartsfield v. Miami-Dade County*, 90 F. Supp. 2d 1363, 1374 (S.D. Fla. 2000) (quoting from *Crady v. Liberty National Bank*, 993 F.2d 132, 136 (7th Cir. 1993), *aff'd*, 248 F.3d 1179 (11th Cir. 2001)).

Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; whether the employment action is materially adverse is determined, at least in part, by applying the reasonable person in the circumstances standard.  *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir.2001).  Indeed, the determination of whether something constitutes an adverse employment action must be made on a case-by-case basis and, like the hostile work environment analysis, contains both an objective and a subjective component.  *Hansen v. Perry Technologies*, 206 F. Supp. 2d 1223 (S.D. Fla. 2002) (citing *Doe v. Dekalb County Sch. Dist.*, 145 F.3d 1441, 1448-49 (11th Cir.1998)).

Here, there is no allegation that the assignments in question resulted in any loss of pay or benefits, or any other tangible detriment.  While Hughes was assigned job duties at the jail, it is undisputed that he maintained the same pay and benefits as he previously enjoyed and that he has since received all merit and cost of living increases that any other attorney employed in the City Law Department received.  (Powell Affidavit, Exhibit B).  And, again, the assignment to the jail work (as opposed to general litigation duties) does not rise to the level of an adverse employment action, even if the Plaintiff is correct that there was some loss of prestige.  *See Davis*, 245 F.3d at 1239, 1244-45

(noting that in the vast majority of cases, loss of prestige is insufficient to state a Title VII claim and cautioning that when a reassignment involves no "serious and material change in the terms, conditions, or privileges of employment," a court should not act as a "super-personnel department" by questioning an employer's business judgment about where it assigns employees).  Plaintiff has not alleged any adverse action that satisfies the test of substantiality.

Nor is there a fact issue related to Plaintiff's near assignment to collections work.  When Johnson discussed with Hughes the possibility of handling collections in house, Hughes complained and, along with others attorneys, recommended that Johnson outsource the work.   Johnson implemented that recommendation.  Hughes, meanwhile, continued to maintain his regular caseload and job assignments.  (Hughes Depo., Vol. 2, at 140:10-23, 141:1-23, 142:1-23, 143:1-18). Accordingly, the attempted reassignment of collections work fails to support a claim of discrimination.

### 2.    Plaintiff has not produced sufficient evidence of pretext

Plaintiff's race discrimination claims also fail because he cannot show that the City's reasons for taking the actions about which he complains are a pretext for discrimination.  For example, Plaintiff maintains that he was fired because of his race and not because of his perceived violation of JCPB Rules.  However, the record reflects that his co-worker, Love, who engaged in identical conduct, was treated in the exact same manner (*i.e.* was fired), despite their differing races.  This undisputed evidence supports the City's non-discriminatory explanation for its treatment of Hughes.

The posture of Plaintiff's pay disparity claim is similar to his termination allegations, again because of the similar treatment that he and Love received.  During their respective stints of employment with the City, the two have been treated identically.  As for the difference between the

salaries of Hughes and Smith, for the same reasons Plaintiff has not established a *prima facie* case (*i.e.* they are not similarly situated), the City has provided non-discriminatory reasons for the disparities and Hughes cannot show evidence of pretext.  Even if Hughes and Smith had been hired at the same time, by the same decision-maker, into the same position, and by the same administration with the same personnel rules in place, the fact that Smith had earned a Master's Degree in Public Administration in addition to his J.D., when Hughes had not, is a distinction in their backgrounds which would warrant a differentiation in pay.  In addition, Smith's supervisory responsibilities[32] also justify his higher pay rate.

As for Plaintiff's allegations regarding his jail duty assignments, even if those assertions targeted an adverse employment action (which they do not), the City is still due summary judgment on the claim.  Johnson stated that the reason she elected to reassign Hughes to duties at the jail upon his reinstatement was because she had a need for an attorney in that position, and she no longer trusted Hughes based upon his failure to inform her of the proposed Settlement Agreement and Release prior to its presentation to the Personnel Board.  (Hughes Depo., Vol. 2, at 157:6-158:15).  One may debate whether Johnson's assignments to Hughes reflect the best personnel practices.  But this court does not sit as a super-personnel board to evaluate the personnel practices of the City (unless those practices are discriminatory) and an employer may offer subjective reasons to justify an employment action.  *Chapman v. AI Transport*, 229 F.3d 1012, 1033 (11th Cir. 2000) (en banc).  As the Eleventh Circuit stated succinctly and unequivocally in *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466 (11th Cir. 1991):

---

[32]Smith supervises municipal court prosecutors, handles employment cases through the administrative process and in litigation, and performs some JCPB work.  (Johnson Depo. at 72-75; Powell Affidavit, Exhibit C).

Federal courts "do not sit as a super-personnel department that reexamines an entity's business decisions.  No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, the ADEA [, Title VII, or § 1981] does not interfere.  Rather, our inquiry is limited to whether the employer gave an honest explanation of its behavior." *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359, 1365 (7th Cir.1988) (citations omitted). "[F]or an employer to prevail the jury need not determine that the employer was correct in its assessment of the employee's performance; it need only determine that the defendant in good faith believed plaintiff's performance to be unsatisfactory...."  *Moore v. Sears, Roebuck & Co.*, 683 F.2d 1321, 1323 n. 4 (11th Cir.1982) (emphasis in original).  *See also Jones*, 874 F.2d at 1540; *Smith v. Papp Clinic, P.A.*, 808 F.2d 1449, 1452-53 (11th Cir.1987) ("[I]f the employer fired an employee because it honestly believed that the employee had violated a company policy, even if it was mistaken in such belief, the discharge is not 'because of race' and the employer has not violated § 1981.").

*Id.* at 1470.  Here, Hughes has presented no evidence tending to show that Johnson's reasons for assigning him to work at the jail are a pretext for race discrimination.  In fact, the evidence shows that Hughes consented to this reassignment before the three-judge panel that heard the City's appeal.

Moreover, substantial evidence exists which shows Johnson had no discriminatory animus toward Hughes.  For example, Hughes himself describes his initial relationship with Johnson as cordial and professional.  (Hughes Depo., Vol. 2, at 58:14-59:3).  Indeed, Johnson approved a merit raise for Hughes in her first month of employment as City Attorney.  (Powell Affidavit, Exhibit B; Hughes Depo., Vol. 2, at 30:1-23, 31:1-10, 32:1-5).  Similarly, Johnson asked Hughes to apply and compete for promotion when Principal Attorney positions became available.  (Hughes Depo., Vol. 2, at 28:9-22, 32:1-5, 32:6-23, 33:1-10, 33:11-23, 34:1-5, 34:6-23, 166:19167:1, 167:23-168:7). Within five months of her employment as City Attorney, Johnson selected Hughes over other candidates for promotion to Principal Attorney and approved another salary increase.  (*Id.; see also* Powell Affidavit, Exhibit B).  Since Plaintiff's promotion, Johnson has never refused any opportunity to further increase his salary and has never denied him any promotion for which he has

33

applied. (Powell Affidavit, Exhibit B; Hughes Depo., Vol. 2, at 124:3-8). Furthermore, Johnson has never said anything to Hughes that would lead Hughes to believe that she would discriminate on the basis of race.[33] (Hughes Depo., Vol. 2, at 128). Accordingly, the City is due summary judgment on Hughes's race discrimination claims.

### C.    Plaintiff Cannot Establish a Material Issue of Fact Regarding His Retaliation Claims

Based upon Plaintiff's brief, he bases his retaliation claims on the following employment actions: "(1) Johnson's threatened reassignment of Hughes to a non-existent Collections Department; (2) Hughes's termination; (3) the City's refusal to reinstate Hughes under clear Board rules following [his JCPB and three-judge panel] victory . . .; [and] (4) Johnson's relegation of Hughes to a dead-end job in the City Jail." (Doc. #105 at III.B. at 11). There are several reasons that the City is due summary judgment on Plaintiff's retaliation claims. First, some of the actions which Plaintiff points to are not protected activity under Title VII or § 1981. Second, as previously discussed, Plaintiff cannot establish that he suffered an adverse employment action. Third, Plaintiff lacks evidence of a causal connection between the alleged protected activity and the purported adverse employment actions. Finally, there is no genuine issue of material fact regarding the legitimate non-retaliatory reasons proffered by the City for the decisions which Plaintiff challenges.

---

[33]Love's testimony that he was told by Johnson that she wanted to promote him (Love), but not Hughes, does not create a material issue of fact regarding Johnson's motive. During the same conversation, Johnson told Love that she knew what Love did and he did a lot of work with which she was satisfied, but she did not know what Hughes did, nor what his assignments were. Similarly, Johnson's initial recommendation that Love be given a pay increase does not create a material issue of fact even though that memorandum was silent as to Hughes. At the time Johnson drafted and sent the memorandum, Love had provided her with information about his assignments and caseload, but Hughes had not.

To successfully establish a retaliation claim under Title VII and § 1981, Plaintiff must show that (1) he engaged in protected activity; (2) he suffered an adverse employment action; and (3) there is causal connection between the protected activity and the adverse employment action. *Stavropoulos v. Firestone*, 361 F.3d 610, 616 (11th Cir. 2004) (citing *Bass*, 256 F.3d at 1117); *see also Gregory v. Georgia Dept. of Human Resources*, 355 F.3d 1277, 1279 (11th Cir. 2004); *Brochu v. City of Riviera Beach*, 304 F.3d 1144, 1155 (11th Cir. 2002).[34]

---

[34]To establish a § 1981 *prima facie* case of retaliation, Plaintiff must prove all of the following: (1) that he participated in an activity protected by § 1981; (2) that he suffered an adverse employment action; and (3) that there is a causal connection between elements (1) and (2). *Hansen v. Perry Technologies*, 206 F. Supp. 2d 1223 (S.D. Fla. 2002) (citing *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000) and *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1336 (11th Cir. 1999)). Retaliation claims under § 1983 and Title VII generally have the same elements of proof and use the same analytical framework. *Pennington v. City of Huntsville*, 261 F.3d 1262 (11th Cir. 2001)(noting similarity between § 1983 and Title VII retaliation claims). However, there are additional elements that Plaintiff must establish to hold a municipality liable for some alleged unlawful act of a supervisor. Specifically, Plaintiff must establish that the alleged unlawful conduct constituted an official policy or custom. Additionally, the § 1981 retaliation claim may, in some circumstances, be different than a Title VII retaliation claim. *See Little v. United Technologies*, 103 F.3d 956 (11th Cir.1997); *Olmsted v. Taco Bell*, 141 F.3d 1457, 1463 n.4 (11th Cir. 1998).

In *Little*, a white plaintiff complained about racially offensive remarks directed at a black co-worker. *Little*, 103 F.3d at 960. He alleged that he was retaliated against in violation of Title VII and § 1981 for making such complaint. 103 F.3d at 958. Since the plaintiff did not allege, much less offer any evidence, that the retaliation was related to his race, the court held that he had not satisfied his *prima facie* burden regarding § 1981. *Id.* at 961. In fact, the court suggested that an opposition claim is not sufficient to make out a § 1981 retaliation claim. *Id.* ("Both the facts and legal framework of Little's action are grounded solely in the opposition clause of Title VII and are unrelated to the concerns explicitly set forth in the language of § 1981."). In any event, an adverse employment action is a necessary condition for all three claims and as previously demonstrated there are none here. *See Miller v. Bed, Bath & Beyond*, 185 F. Supp. 2d 1253, 1274 (N.D. Ala. 2002) (foreclosing a § 1981 retaliation claim because the plaintiff was unable to show an adverse employment action with respect to his Title VII retaliation claim)

### 1. Plaintiff has not shown that he was engaged in activity protected under Title VII, § 1981, and/or § 1983

Based upon his brief, Plaintiff maintains that the following activities are protected from retaliation under Title VII: (1) his complaining to Johnson about her refusal to recommend a salary increase to which he was entitled was discriminatory; (2) his filing of an EEOC charge and lawsuit to protect his interests; (3) his following Johnson's directions and seeking assistance from the JCPB in an attempt to obtain a pay increase; and (4) his defending himself vigorously in his appeal to the JCPB over the City's decision to discharge him.  (Doc. #105 at III.A. at 11).  Therefore, Plaintiff points to a mix of activities which potentially fall under both the "opposition" and "participation" clauses of Title VII.  However, most of Plaintiff's conduct does not qualify as protected activity under Title VII's anti-retaliation provisions.

As a preliminary matter, it is important to note that a plaintiff seeking opposition clause protection under the anti-retaliation provisions of Title VII must also have a "good faith, reasonable belief that the employer has engaged in unlawful discrimination."  Here, Plaintiff cannot meet that obligation with respect to the allegations he makes related to his pay.  *Gaddis v. Russell Corporation*, 242 F. Supp. 2d 1123, 1142-43 (M.D. Ala. 2003) (explaining good faith reasonable belief standard).

The good faith reasonable belief standard has both a subjective and an objective component:

> A plaintiff must not only show that he *subjectively* (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was *objectively* reasonable in light of the facts and record presented. It thus is not enough for a plaintiff to allege that his belief in this regard was honest and bona fide; the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable.

*Little*, 103 F.3d at 960 (emphasis in original).  Hughes cannot satisfy the good faith reasonable belief test due to his testimony that his similarly situated colleague, James Love, also approached the City

36

in an effort to seek a similar salary increase. Hughes concedes (as he must) that he was similarly situated to Love and that they both sought the exact same pay increase. This demonstrates that his complaint about not receiving the pay increase is really one of general fairness and equity, not discriminatory practices under § 1981 or Title VII. Furthermore, regardless of Hughes's subjective feelings, objectively, it is simply not reasonable for him to believe that both he and Love (who is African-American) were both discriminated against because of their race when they were treated identically in terms of pay. *See Harper v. Blockbuster Entertainment Corp.,* 139 F.3d 1385, 1388 n.2 (11th Cir.1998) (finding failure to charge the employee who opposes an employment practice with substantive knowledge of the law "would eviscerate the objective component of our reasonableness inquiry"). Therefore, from an objective standpoint items (1), (3), or (4) listed above[35] simply do not qualify under the good faith reasonable belief test and thus cannot support a retaliation claim.[36]

### 2.   Plaintiff's alleged retaliation does not constitute an adverse employment action

The City is also entitled to summary judgment on Plaintiff's retaliation claims because the asserted retaliation does not rise to the level of an adverse employment action. As previously discussed in section IV.B. above, many of Plaintiff's alleged retaliatory acts are not substantial enough and do not amount to the type of conduct prohibited by the anti-discrimination laws. For

---

[35]The protected activity referenced in item (2) listed above – Plaintiff's filing of an EEOC charge and this lawsuit – clearly constitutes participation, and, therefore, Plaintiff is not required to show he had such a good faith reasonable belief. As noted *infra*, however, Defendants are entitled to summary judgment with respect to that claim for other reasons.

[36]The court notes that Plaintiff does not clarify which of his activities constitute "opposition" and which are "participation." However, items (1), (3), and (4) do not involve the EEOC process, and therefore do not fall within the purview of the "participation" clause.

example, Johnson's threatened reassignment of Hughes to do collections work does not constitute

an adverse employment action.  Similar to the non-existent pay disparity between Love and Hughes,

the assignment to collections never took effect; accordingly, Hughes suffered no substantial negative

impact from that so-called "threat."  Likewise, Hughes's reassignment to the City Jail is not an

adverse employment action for the reasons explained in section IV.B. [37]

Additionally, the City's refusal to reinstate Hughes pending the appeal to the three-judge

panel does not amount to an adverse employment action because the record shows that maintaining

the status quo was part of the accepted review and appeal process.  (*See, e.g.*, Doc. #97, at Ex. I, at

2 ("The Personnel Board ordered your client reinstated and the city appealed this ruling to the Circuit

Court.  The court has ordered your client reinstated pending a final hearing on the city's appeal.")).

Moreover, JCPB Rule 6.13 clarifies that a decision of the Board "shall be final, **subject to appeal

by either party** to the Circuit Court to review questions of law and the question of whether or not

the decision or order of the Board is supported by substantial legal evidence." (Doc. #97, at Ex. C,

at  6-6 ¶ 6.13 (emphasis added)).  Plaintiff has not offered examples of other employees who sought

reinstatement and who were immediately reinstated during the City's appeal.  His merely citing to

some portions of the JCPB Rules as support for his claim is not enough.  Furthermore, the City did

reinstate Hughes consistent with the final order from the three-judge panel denying the City's

appeal–there was no delay on the part of the City in implementing the "final" action of reinstating

---

[37] As pointed out by Defendants in their reply, and as already noted, Hughes voluntarily agreed
to the reassignment in front of the three-judge panel, who heard the City's appeal.  Lawson Aff. ¶
5; Hard Decl. ¶¶ 5, 7.  Moreover, Plaintiff's consent to the change was understandable, especially
in light of the November 5, 2002 informal opinion from the Alabama State Bar, obtained by his
counsel, that Plaintiff "does indeed have a conflict of interest pursuant to Rule 1.7(b) of the Rules
of Professional Conduct."  (Doc. #97, at Ex. I, at 2).

Hughes to work that was acceptable to him and that would alleviate concerns about his conflict of interest.  (*See* Lawson Aff. ¶ 5; Hard Decl. ¶¶ 5, 7).

>    **3.**     **A review of the undisputed facts regarding the entire sequence of events leading to Plaintiff's discharge shows a lack of a causal connection between it and his participation in the EEO process**

Based upon the analysis above, the only remaining potentially viable adverse employment action which Hughes suffered is his discharge.  On May 17, 2002, Plaintiff received the notice of determination hearing advising him that "[t]he personnel action could be to discipline and may result in suspension, demotion, or dismissal."  The notice further advised Hughes that the determination hearing was set for May 22, 2002, at 9:00 a.m.  The notice set forth the JCPB Rules at issue and made no reference to any anticipated, much less pending EEOC matters involving Hughes.  Exactly one day before the determination hearing, Plaintiff filed his EEOC charge alleging retaliation (among several other things), and referenced the May 17, 2002 notice of determination hearing that he had received.  On this same date, Hughes also filed his lawsuit in this court.  (Doc. #1).  Johnson delegated her authority to impose discipline upon Hughes and Love to her Deputy Chief, Lawson.  Lawson made the decision to discharge Hughes and Love independent of any influence from Johnson.  (Hughes Depo., Vol. 2, at 139:5-23, 140:1-9).

The required causal link between Plaintiff's filing of an EEOC charge and this lawsuit on the one hand, and his discharge on the other, is wholly lacking in this case.  That is the case because Plaintiff is erroneously basing his retaliatory discharge claim upon an adverse process that began on May 17, 2002 – *i.e.*, the date when Hughes became aware of the disciplinary hearing (as opposed to any specific disciplinary measure).  However, as of that date (May 17, 2002), Plaintiff had not filed

an EEOC charge or this lawsuit, nor had he otherwise "participated" in an activity that would trigger anti-retaliation protection. Consequently, Plaintiff cannot show that his dismissal is causally connected to the filing of his EEOC charge because, six days earlier, Johnson had already initiated disciplinary proceedings against Hughes and had given him prior notice that he could suffer an adverse employment action, including discharge.[38]

Moreover, these undisputed facts highlight another, at least equally substantial reason for granting Defendant's motion on this claim: Absent evidence of knowledge of on the part of the decision-maker, no causal relation exists, and the time line in this case, necessarily means that neither Johnson nor Lawson had the requisite knowledge when the notice of determination was sent to Hughes. *See Clover v. Total System Servs., Inc.*, 176 F.3d 1346, 1354 (11th Cir. 1999) (holding that the decision-maker must be aware of the protected activity for a plaintiff to claim retaliation); *Bass*, 256 F.3d at 1119 ("[T]he plaintiff must show that the person taking the adverse action was aware of the protected expression.") (citation omitted).

**4.   There is no substantial evidence rebutting the legitimate non-discriminatory reason for the act Plaintiff alleges constitute retaliation**

Even assuming that Plaintiff is able to satisfy his *prima facie* burden, the City has articulated a legitimate, non-retaliatory reason for its decision to discharge Hughes–the City's belief that Hughes had violated JCPB Rules 6.2 (c) and 6.2 (p) in his efforts to enter into a purported Settlement

---

[38]The court notes that Plaintiff's reading of the time line relating to the discharge is consistent: "Johnson became enraged that they had done so and, **on May 17, 2002, initiated termination proceedings against Hughes**." (Doc. #105, at II.C.2., at 13) (emphasis added).

Agreement and Release.[39] *Holifield,* 115 F.3d at 1564. "This intermediate burden is 'exceedingly light.'" *Id.* (citing *Turnes v. AmSouth Bank, N.A.,* 36 F.3d 1057, 1061 (11th Cir.1994)). The employer has the burden of production, not of persuasion, and thus does not have to persuade a court that it was actually motivated by the reason advanced. *See Cantrell v. Jay R. Smith Manufacturing,* 248 F. Supp. 2d 1126 (M.D. Ala. 2003) (citing *McDonnell Douglas,* 411 U.S. at 802; *Burdine,* 450 U.S. at 253-55).

Plaintiff then has the burden to show pretext in the City's explanation for its decision. In addressing the issue of pretext, the Supreme Court has stated:

> Thus, a plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated. This is not to say that such a showing by the plaintiff will *always* be adequate to sustain a jury's finding of liability. Certainly there will be instances where, although the plaintiff has established a *prima facie* case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.

*Reeves,* 530 U.S. at 148 (emphasis in original). Therefore, despite a plaintiff's efforts to demonstrate an issue of fact regarding the truthfulness of an employer's asserted justification for an adverse employment decision, judgment as a matter of law in favor of the employer would still be appropriate if the record: 1) conclusively demonstrates some other, nondiscriminatory basis for the decision; or 2) reveals only a weak issue of fact coupled with plentiful evidence that no illegal discrimination took place.

---

[39]The court similarly concludes that Plaintiff has failed to carry his burden of establishing pretext as to the other bases upon which he relies to support retaliation.

For the same reasons that Plaintiff cannot establish a causal connection on his retaliatory discharge claim, he cannot show pretext as a matter of law. Plaintiff has not pointed to any evidence from which a reasonable jury could conclude that Plaintiff's EEOC charge and lawsuit (as opposed to the interplay of Plaintiff's conduct and JCPB Rules 6.2 (c) and 6.2 (p)) were the true reasons for his discharge. The termination proceedings based upon those JCPB Rules began six days before the filing of his EEOC charge and this lawsuit. In addition, there is no evidence of either Johnson or Lawson doing or saying anything that would lead a jury to believe that either retaliated against Hughes.

### D. Defendant Johnson is Protected by Qualified Immunity

The court also finds that Johnson is due summary judgment on Plaintiff's §1983 claims against Defendant Johnson because she is due qualified immunity. Qualified immunity offers complete protection for government officials sued in their individual capacity if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The analysis utilizes an "objective reasonableness standard, giving a government agent the benefit of the doubt unless h[is] actions were so obviously illegal in the light of then-existing law that only an official who was incompetent or who knowingly was violating the law would have committed them." *GJR Investments, Inc. v. County of Escambia, Fla.*, 132 F.3d 1359, 1366 (11th Cir. 1998). As the Eleventh Circuit has recently stated, "the salient question ... is whether the state of the law [at the time of the events in question] gave respondents fair warning that their alleged treatment of [the plaintiff] was unconstitutional." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1278 (11th Cir. 2004) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). Courts should "generally accord ... official

conduct a presumption of legitimacy." *United States Department of State v. Ray,* 502 U.S. 164, 179 (1991).

Under the qualified immunity doctrine, government officials performing discretionary functions are immune from suit unless the alleged conduct violates "clearly established [federal] statutory or constitutional rights of which a reasonable person would have known." *Harlow,* 457 U.S. at 818.[40]  "Qualified immunity operates to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Hope,* 536 U.S. at 739 (internal quotations and citation omitted).  "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Id.* (internal quotations and citations omitted).

## 1.     Johnson acted within the scope of her discretionary authority

As a threshold matter, the government official first must show that he acted within his discretionary authority; in other words, that "objective circumstances [exist] which would compel the conclusion that his actions were undertaken pursuant to the performance of his duties and within the scope of his authority." *Rich v. Dollar,* 841 F.2d 1558, 1564 (11th Cir. 1988).  In determining whether this test is met, there is no analysis of whether the official actually acted lawfully.  *See Sims v. Metropolitan Dade County,* 972 F.2d 1230, 1236 (11th Cir. 1992).  Rather, the issue is whether "the act complained of, if done for a proper purpose, would be within, or reasonably related to, the

---

[40]"Clearly established" rights must be "developed [] in a concrete factual context so as to make it obvious to a reasonable government actor that his actions violate federal law." *Anderson v. Creighton,* 483 U.S. 635, 640 (1987).  Only Supreme Court, Eleventh Circuit, and Alabama Supreme Court cases can "clearly establish" the law in this Circuit.  *Thomas v. Roberts,* 323 F.3d 950, 955 (11th Cir. 2003).

outer perimeter of [the governmental officer's] discretionary duties." *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1282 (11th Cir. 1998).  As such, "[i]t is perfectly logical for a court to find that someone who was acting illegally was acting within his discretionary authority." *Godby v. Montgomery County Bd. of Educ.*, 996 F. Supp. 1390, 1401 (M.D. Ala. 1998).  Given this broad standard, and based upon the undisputed facts, the court has no hesitation in finding that Defendant Johnson was acting "pursuant to the performance of [his/her] duties" and "within the scope of [her] authority" when she took the actions forming the basis for Plaintiff's § 1983 claims.

### 2. Plaintiff has not shown a violation of a constitutional right that was clearly established

Having determined that Johnson was operating within her discretionary authority, the court must ask whether Plaintiff's allegations, if true, establish the violation of a constitutional or statutory right.  *Bogle v. McClure,* 332 F.3d 1347, 1355 (11th Cir. 2003) (citing *Hope,* 536 U.S. at 736 and *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  "If a constitutional or statutory right would have been violated under the plaintiff's version of the facts, the next step is to ask whether the right was clearly established."  *Bogle*, 332 F.3d at 1355.

With respect to Plaintiff's equal protection allegations under the Fourteenth Amendment (which mirror his Title VII and § 1981 claims), Johnson is due qualified immunity as to them because, even assuming Plaintiff's allegations are true, Plaintiff cannot present substantial evidence that he was discriminated or retaliated against.  That is, he has not met his burden of making a sufficient showing that he was subjected to a violation of his rights.[41]

---

[41]For example, Plaintiff has not shown he was subjected to an adverse employment action (*see Portera v. State of Alabama Department of Finance*, 322 F. Supp. 2d 1285, 1287 (M.D. Ala. 2004) ("In order for a government employee to be held liable in his individual capacity, it must be clearly established that the government employee's action was an adverse - employment action at

### 3. In any event, Johnson is entitled to qualified immunity under *Foy v. Holston*

But there are even more reasons to grant qualified immunity here.  Even if Plaintiff's so-called "facts" are deemed stipulated facts, and even if Johnson did violate Plaintiff's constitutional rights by taking adverse employment actions against him for his protected conduct on the basis of race,[42] the court finds that Johnson is still due qualified immunity under Eleventh Circuit law based on *Foy v. Holston*, 94 F.3d 1528 (11th Cir. 1996).  In *Foy*, the Eleventh Circuit held that, "[w]here the facts assumed for summary judgment purposes in a case involving qualified immunity show mixed motives (lawful and unlawful motivations) and pre-existing law does not dictate that the merits of the case must be decided in plaintiff's favor, the defendant is entitled to immunity."  *Foy*, 94 F.3d at 1533.

The Eleventh Circuit further clarified in *Stanley v. City of Dalton, Ga.*, 219 F.3d 1280 (11th Cir. 2000), that a "defendant is entitled to qualified immunity under the *Foy* rationale only where, among other things, the record indisputably establishes that the defendant in fact was motivated, at least in part, by lawful considerations."  *Stanley*, 219 F.3d at 1296; *Bogle*, 332 F.3d at 1356; *see also Johnson v. City of Ft. Lauderdale, Fla.*, 126 F.3d 1372, 1379 (11th Cir.1997).  Thus, even assuming that a defendant official acted with some discriminatory or retaliatory motive, such does not "clearly establish that a reasonable official faced with the same evidence of [plaintiff's perceived

---

the time the act was taken.")), nor can he establish a *prima facie* case or show pretext.

[42]*See Bogle*, 332 F.3d at 1355.  "[T]here is no doubt that [during 2002, the operative time frame of Plaintiff's dismissal,] it was clearly established that intentional discrimination in the workplace on account of race violated federal law."  *Bogle*, 332 F.3d at 1355 (citing *Alexander v. Fulton County, Ga.*, 207 F.3d 1303, 1321 (11th Cir. 2000)).

misconduct]" would not have acted in the same manner.[43]  *Johnson*, 126 F.3d at 1379; *see Stanley*, 219 F.3d at1297 ("Even if a reasonable [public official] acted with retaliatory motive, the law in 1997 did not clearly establish that a reasonable [public official] - faced with the same undisputed evidence of [plaintiff's perceived] misconduct - should not have terminated [plaintiff] in the same manner.").

In this case, the court finds that Johnson is entitled to qualified immunity under *Foy* and its progeny.  The Rule 56 record establishes that Johnson possessed a substantial lawful motive; therefore, even if a discriminatory motive might also exist on Johnson's part, that "does not sweep qualified immunity from the field even at the summary judgment stage." *Foy*, 94 F.3d at 1534-35.

---

[43]As the Eleventh Circuit stated in *Foy*:

> Our former decisions, however, must not be understood to rule out qualified immunity wherever discriminatory intent appears in the summary judgment record even if discriminatory intent is an element of the underlying constitutional tort.

> Qualified immunity is too important a right of public servants and too important a public policy to be nullified so easily.  The Supreme Court has not instructed us to drop qualified immunity (with its test of objective reasonableness) from cases in which discriminatory intent is an element of the underlying tort.  *Cf. Anderson v. Creighton*, 483 U.S. 635, 645-46, 107 S.Ct. 3034, 3042, 97 L.Ed.2d 523 (1987) ("*Harlow* clearly expressed the understanding that the general principle of qualified immunity it established would be applied 'across the board.'") So, whenever a public officer is sued for money damages in his individual capacity for violating federal law, the basic qualified immunity question looms unchanged: Could a reasonable officer have believed that what the defendant did might be lawful in the circumstances and in the light of the clearly established law?

*Foy*, 94 F.3d at 1533-34.

A reasonable public official in Johnson's position under the circumstances of this case would not have known that he or she could not rely upon her interpretation of the JCPB Rules in (1) refusing to recommend a multi-step pay increase for Hughes, or (2) initiating termination proceedings against him. Plaintiff has presented no case law (or anything else) that establishes that "a reasonable [public official] - faced with the same undisputed evidence of [plaintiff's perceived misconduct] - should not have [taken those actions] in the same manner." *Stanley*, 219 F.3d at 1297. Again, applying *Foy*:

> No jury could find that it would have been unlawful for [a City Attorney] to do as [Johnson] did *if* the worker lacked discriminatory intent. More important, no jury could find that reasonable [City Attorneys] would never have done the things [Johnson] did but for a discriminatory intent. In addition, the record makes it clear that Defendants' acts were actually motivated by lawful considerations without which they would not have acted.

*Foy*, 94 F.3d at 1535. Thus, based on *Foy*, the court finds that summary judgment on Plaintiff's §1983 claims is also due to be granted to Johnson on qualified immunity grounds.

### E.     The City is Due Summary Judgment on Plaintiff's § 1983 Claims

Plaintiffs' claims under § 1983 against the City are governed by the rules established by the Supreme Court in *Monell v. Department of Social Services*, 436 U.S. 658 (1978). In that case, the Supreme Court placed strict limitations on municipal liability. In order for the City to be subjected to § 1983 liability, *Monell* requires more than a *respondeat superior* theory. Indeed, to hold a city liable, a plaintiff must prove, at a minimum: (1) that the individual defendant's actions were unconstitutional; and (2) that a municipal "policy" or "custom" of the municipality caused these violations to occur. *See, e.g., Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998) ("[A] municipality may be held liable [under section 1983] for the actions of a [public official] only when

municipal 'official policy' causes a constitutional violation."). A plaintiff, like Hughes, has two methods by which to establish a county's policy: identify either (1) an officially promulgated county policy or (2) an unofficial custom or practice of the county shown through the repeated acts of a final policymaker for the county. *Monell*, 436 U.S. at 690-91, 694, 98 S.Ct. 2018; *Brown v. Neumann*, 188 F.3d 1289, 1290 (11th Cir. 1999) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 121 (1988)). Because a county rarely will have an officially-adopted policy of permitting a particular constitutional violation, most plaintiffs must show that the county has a custom or practice of permitting it and that the county's custom or practice is "the 'moving force [behind] the constitutional violation.'" *City of Canton v. Harris*, 489 U.S. 378, 389 (1989) (alteration in original) (citing *Monell*, 436 U.S. at 694 and *Polk County v. Dodson*, 454 U.S. 312, 326 (1981)). A custom or practice, while not adopted as an official formal policy, may be so pervasive as to be the functional equivalent of a formal policy. *Monell*, 436 U.S. at 690-91, 98 S.Ct. 2018; *Church v. City of Huntsville*, 30 F.3d 1332, 1343 (11th Cir. 1994). A single incident is not so pervasive as to be a custom or practice. *City of Oklahoma v. Tuttle*, 471 U.S. 808, 823-24 (1985) (plurality) (stating that when establishing liability for a custom or practice, "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell"*).

Under this analysis, the City is due summary judgment on Plaintiff's § 1983 claims for two reasons. First, because the court has concluded that no underlying violations of Plaintiff's constitutional rights took place, there can be no municipal liability on the part of the City. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (recognizing that if person suffers no constitutional injury, then no liability may exist against government body); *Rooney v. Watson*, 101 F.3d 1378, 1381 (11th Cir. 1996), *cert. denied.*, 522 U.S. 966 (1997) (recognizing that "an inquiry

into a governmental entity's custom or policy is relevant only when a constitutional deprivation has occurred"), *cert. denied.*, 522 U.S. 966 (1997); *Hardin v. Hayes*, 52 F.3d 934, 939 n.8 (11th Cir. 1995) (holding that when underlying act at issue is not constitutional violation, there is no need to consider whether municipal policy is deficient).

Second, even if Johnson had violated Hughes's rights, the City would still be entitled to summary judgment because there is no record evidence of a municipal policy or custom that caused the purported constitutional violations to occur. Quite obviously, there is no evidence of any officially-adopted City policy of permitting discrimination or retaliation. Nor is there any evidence that Johnson was a decisionmaker vested with final authority to create policy. *See McMillan v. Monroe County*, 520 U.S. 781, 784 (1997). It is well settled that a municipal official is not a final policymaker if her decisions are subject to meaningful review. *See Morro v. City of Birmingham*, 117 F.3d 508, 510 (11th Cir. 1997) (police chief not a final policymaker because his decision was subject to review); *Scala v. City of Winter Park*, 116 F.3d 1396, 1401 (11th Cir. 1997) (city manager not a final policymaker because his decision was subject to "meaningful administrative review"); *Hill v. Clifton*, 74 F.3d 1150, 1152 (11th Cir. 1996) (city police chief was not a final policymaker because his employment decisions could be reversed by the city manager); *Martinez v. City of Opa-Locka*, 971 F.2d 708, 713-15 (11th Cir. 1992). Here, any "decision" by Johnson was subject to Mayor approval and could be (and indeed in this case was) appealed to the JCPB.

## V.   Conclusion

For the reasons stated above, Defendants' Motion for Summary Judgment is due to be granted as it relates to the Plaintiff's claims under Title VII and § 1983. The court finds that no genuine issues of material fact remain for trial as to those claims and that Defendants are entitled to

judgment as a matter of law.  The court will enter an order dismissing Plaintiff's Complaint with prejudice.

**DONE** and **ORDERED** this 24th day of August, 2005.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE